

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-20-00058-CV

### IN THE MATTER OF THE ESTATE OF KENNETH CURTIS ANDREWS, DECEASED

From the 81st Judicial District Court, Wilson County, Texas
Trial Court No. 18-04-0239-CVW
Honorable Sid L. Harle, Judge Presiding

Opinion by:     Lori I. Valenzuela, Justice

Sitting:        Rebeca C. Martinez, Chief Justice
                Luz Elena D. Chapa, Justice
                Lori I. Valenzuela, Justice

Delivered and Filed: June 9, 2021

AFFIRMED

In the underlying probate proceeding, the jury found that the decedent had testamentary capacity to sign his will and did not sign the will under undue influence. The trial court rendered a judgment admitting the decedent's will into probate. On appeal, appellant, Vincent Doebber, does not challenge the legal and factual sufficiency of the jury's findings. Instead, he challenges certain evidentiary rulings made by the trial court, which he asserts cumulatively led to the rendition of an improper judgment. We affirm.

## BACKGROUND

On March 6, 2018, the decedent, Kenneth Andrews, died in his own home at the age of seventy. Prior to his death, he maintained a relationship with Casper Moczygemba and Casper's wife, Rosalee. In fact, Kenneth and Casper were life-long friends and had known each other since

the third grade. It was Casper who took Kenneth to the hospital in February 2018. Six days after being admitted to the hospital, Kenneth discharged himself against medical advice, and was driven home by Casper. Up to this date, Kenneth did not have a written will.

On March 1, 2018, at Rosalee's request, a lawyer, Dena Witte, met Kenneth, Casper, and Rosalee at Kenneth's house. The next day, Witte and two witnesses went to Kenneth's house to execute a will and powers of attorney. The will left everything to Casper and Rosalee (collectively, the "Moczygembas"). After Casper applied to probate the will, Vincent Doebbler filed a will contest and application to determine heirship. Vincent was born in 1980 to Sherrell and Bruce Doebbler. However, Vincent claimed Kenneth admitted he was Vincent's biological father during their conversations beginning in either October or November of 2017. During discovery, Vincent obtained a sample of Kenneth's tissue usable for DNA testing. A DNA test revealed Kenneth to be Vincent's biological father. Eventually the dispute over Kenneth's capacity to sign his will and whether he signed the will under undue influence was heard by a jury. At trial, the Moczygembas called their expert, Dr. Christopher Ticknor, to testify, and Vincent called his expert, Lisa Clayton, to testify. After hearing from multiple witnesses on each side and their experts, the jury entered a verdict in favor of the Moczygembas and Vincent appealed.

## DISCUSSION

On appeal, Vincent asserts the trial court erred by (1) denying his pre-trial motion to strike Ticknor, (2) failing to strike Ticknor's testimony during trial and permitting Ticknor to introduce undisclosed and conclusory opinions, (3) allowing Ticknor to rebut the opinions of Vincent's expert, and (4) permitting the Moczygembas to inquire into Vincent's fee agreement with his attorney.

**A.** **Vincent's Pretrial Motion to Strike**

Prior to trial, Vincent moved to strike Ticknor's testimony as a sanction for failing to disclose and/or intentionally withholding information required to be disclosed under Texas Rules of Civil Procedure 193 and 194 or, alternatively, to strike Ticknor's testimony in its entirety because his opinions were irrelevant, improper, and conclusory. The trial court denied the motion.

On appeal, Vincent asserts the trial court erred for three reasons. First, Vincent contends Ticknor sought to improperly render an opinion on a pure question of law. Second, his opinions were speculative and conclusory because Ticknor stated that any opinion he offered would be an assumption. Finally, Vincent contends Ticknor's opinion on capacity shifted the burden of proof to Vincent.

The Moczygembas designated Ticknor, in pertinent part, as follows:

As set forth in more detail in the attached report, Dr. Ticknor is expected to testify regarding the mental and physical condition of Decedent Kenneth Curtis Andrews from February 19, 2018 to March 6, 2018, including his testamentary capacity at the time he executed his Will of March 2, 2018. The opinions reached by Dr. Ticknor include the following:

a. There is little, or no, medical or objective evidence Kenneth Andrews lacked cognitive capacity on the day he executed his Last Will and Testament on March 2, 2018. . . ..

**1.** **Question of law**

Vincent asserts Ticknor's opinion that there was little or "no, medical or objective evidence Kenneth Andrews lacked cognitive capacity on the day he executed his Last Will and Testament on March 2, 2018" amounts to an opinion on a pure question of law.

"No witness, whether expert or non-expert, is permitted, over proper objection, to state his opinion as to the legal capacity of a person to make a will, because the determination of the existence of testamentary capacity involves the application of a legal definition to the facts."

*Lindley v. Lindley*, 384 S.W.2d 676, 682 (Tex. 1964); *accord Carr v. Radkey*, 393 S.W.2d 806, 813 (Tex. 1965). But "competent evidence about [a person's] mental condition and mental ability or lack of it which does not involve legal definitions, legal tests, or pure questions of law should be admitted." *Carr*, 393 S.W.2d at 813. A qualified expert witness may testify as to whether a person "had the capacity to know the objects of his bounty, the nature of the transaction in which he was engaged, the nature and extent of his estate, and similar questions." *Id.*

Vincent argues that whether or not there is "no evidence" of a fact issue is a question of law. However, Vincent relies on cases in which the appellant challenged the legal sufficiency of the evidence at trial. *See Houston Sports Ass'n v. Russell*, 450 S.W.2d 741, 744 (Tex. Civ. App.—Houston [14th Dist.] 1970, writ ref'd n.r.e.) (holding, "whether there is any probative evidence of the facts found by the jury upon the basis of which liability was imposed upon Houston Sports Association . . . is the 'no evidence' question of law.'"); *Luna v. Luna*, 13-09-00201-CV, 2011 WL 1642222, at *2 (Tex. App.—Corpus Christi Apr. 28, 2011, no pet.) (mem. op.) (reviewing legal and factual sufficiency of evidence in support of trial court's findings of fact); *see also GuideOne Elite Ins. Co. v. Fielder Rd. Baptist Church*, 197 S.W.3d 305, 311 (Tex. 2006) (holding, the "reasonable and necessary requirements [for an award of costs and reasonable attorney's fees under the Declaratory Judgments Act] are questions of fact to be determined by the factfinder; the equitable and just requirements are questions of law for the trial court to decide."). In this case, Vincent did not challenge the legal or factual sufficiency of the evidence in support of the jury's findings.

Vincent also argues the trial court erred by not granting his pretrial motion to strike because an expert, such as Ticknor, may not opine on a pure question of law. An expert may not testify on pure questions of law. *Mega Child Care, Inc. v. Texas Dep't of Protective & Regulatory Servs.*, 29 S.W.3d 303, 309 (Tex. App.—Houston [14th Dist.] 2000, no pet.). "However, an expert

witness may offer an opinion on a mixed question of law and fact." *Id.* "An issue involves a mixed question of law and fact when a standard or measure has been fixed by law and the question is whether the person or conduct measures up to that standard." *Id.* Thus, an expert is not allowed to testify directly to his understanding of the law but may only apply legal terms to his understanding of the factual matters in issue. *Welder v. Welder*, 794 S.W.2d 420, 433 (Tex. App.—Corpus Christi 1990, no writ). At the pre-trial stage, during a discovery dispute, "[n]o ultimate conclusions have been made, no liability has been set, no decisions on issues of law have been made [because] [t]hese issues are for trial." *Packard v. Guerra*, 252 S.W.3d 511, 533 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). Under these circumstances, we cannot conclude the trial court abused its discretion by refusing to strike—before trial—Ticknor's testimony in its entirety because he might—at trial—opine on a pure question of law.

### 2.     Conclusory and speculative

Vincent contends any opinion Ticknor could render at trial would be conclusory and speculative because his answers during his deposition routinely included answers such as "we don't know" or any opinion would be "an assumption." However, every time Ticknor stated he either did not know or would have to make an assumption, his answer was to a question regarding Kenneth's medical condition. Vincent provides no authoritative support for his contention on appeal that Ticknor's answers "eliminated his basis to present *any* opinion on [Kenneth's] condition, much less his capacity, on March 2, 2018." Because Ticknor was designated to opine on Kenneth's testamentary capacity, we conclude the trial court did not abuse its discretion by denying Vincent's pre-trial motion to strike Ticknor's testimony on the basis that it was conclusory or speculative.

### 3. Burden of proof

Vincent asserts allowing Ticknor to render an expert opinion that "there is little, or no, medical or objective evidence [Kenneth] lacked cognitive capacity" improperly shifted the burden of proof to him.

"A testator must be of 'sound mind,' which means having testamentary capacity at the time the testator executes the will." *In re Estate of O'Neil*, No. 04-11-00586-CV, 2012 WL 3776490, at *6 (Tex. App.—San Antonio Aug. 31, 2012, no pet.) (mem. op.). "The key inquiry is whether the testator had testamentary capacity on the day the will was executed[.]" *Estate of Danford*, 550 S.W.3d 275, 281 (Tex. App.—Houston [14th Dist.] 2018, no pet.). As the will proponent facing a contest before the will is admitted to probate, the Moczygembas had the burden of establishing testamentary capacity. *O'Neil*, 2012 WL 3776490, at *6. If they satisfied their burden, "[t]he burden of producing evidence negating testamentary capacity then shifts to the will's opponent, although the burden of persuasion always remains with the proponent." *Danford*, 550 S.W.3d at 281.

The jury charge asked whether "[Kenneth had] testamentary capacity to sign [his will] dated March 2, 2018" and the jury answered "yes." This question properly placed the burden on the Moczygembas to establish testamentary capacity. Therefore, if the trial court erred, the error was harmless. *See Walker v. Eason*, 643 S.W.2d 390, 391 (Tex. 1982) (per curiam) ("Although special issue number one incorrectly placed the burden of proof, the instruction in the court's charge correctly placed the burden of proof. [T]the jury made a definitive finding that Pearl Eason 'did not have sufficient mental capacity.' Thus, any error of the trial court in overruling the objections to special issue number one was harmless error.").

**4.** **Sanctions**

Prior to trial, Vincent served requests for disclosure and a notice of intent to depose Ticknor, which included a subpoena requesting all documents provided to Ticknor by anyone else regarding the case and all correspondence between Ticknor and the Moczygembas' law firm, Jackson Walker LLP ("Jackson Walker"). In addition to the above reasons for striking Ticknor's testimony, Vincent asserts the trial court erred by denying his motion to strike Ticknor's testimony as a sanction on the basis that Ticknor failed to bring to his deposition all emails between himself and Jackson Walker.

During the deposition, Ticknor stated he had not brought some correspondence with him that was responsive to the subpoena. Just before a break in the deposition, Ticknor also said he had not given Jackson Walker a "draft" of his report. After the break, Ticknor produced several pages of emails between himself and Jackson Walker, one of which contained an attachment labeled as a "draft" of Ticknor's report. Ticknor explained the attachment was not a draft, but was, instead, his final report that contained misspellings and font errors, which were corrected by Jackson Walker. When asked why the attachment was labelled "draft," Ticknor said he did not know. Later in the deposition, Jackson Walker produced additional emails responsive to the subpoena.

On appeal, Vincent asserts that the deliberate withholding of correspondence and drafts of Ticknor's expert report required that Ticknor be automatically excluded under Texas Rule of Civil Procedure 193.6, which provides as follows:

> A party who fails to make, amend, or supplement a discovery response in a timely manner may not introduce in evidence the material or information that was not timely disclosed, or offer the testimony of a witness (other than a named party) who was not timely identified, unless the court finds that:
> (1) there was good cause for the failure to timely make, amend, or supplement the discovery response; or

      (2) the failure to timely make, amend, or supplement the discovery response will not unfairly surprise or unfairly prejudice the other parties.

TEX. R. CIV. P. 193.6(a).

Sanctions are used "to assure compliance with discovery and deter those who might be tempted to abuse discovery in the absence of a deterrent." *Cire v. Cummings*, 134 S.W.3d 835, 839 (Tex. 2004). "We review a trial court's decision relating to discovery sanctions under an abuse of discretion standard." *Mares v. Ford Motor Co.*, 53 S.W.3d 416, 419 (Tex. App.—San Antonio 2001, no pet.). We will reverse the trial court's ruling only if it was arbitrary or unreasonable. *See id.*

At the hearing on the motion to strike, the Moczygembas' attorney explained Jackson Walker played no part in Ticknor responding to the subpoena because Ticknor said he would bring all the correspondence with him. When, during the deposition, it was discovered emails were missing, Jackson Walker found the emails and gave them to Vincent's attorney.

On this record, we cannot conclude the trial court abused its discretion. First, the trial court may have determined Jackson Walker timely amended the response to the subpoena as soon as it realized Ticknor did not bring all the requested correspondence to his deposition. Second, even if untimely, the trial court may have determined Ticknor's failure to bring all the emails and Vincent not receiving the missing emails until during the deposition did not unfairly surprise or unfairly prejudice Vincent. The record reflects Vincent had over an hour left in which to continue deposing Ticknor after he saw the emails and he chose not to do so. We, therefore, conclude the trial court did not abuse its discretion by denying Vincent's pre-trial motion to strike Ticknor's testimony as a sanction.

**B. Striking Ticknor's Trial Testimony**

Vincent asserts Ticknor's and the Moczygembas' violation of court orders resulted in misconduct such that Ticknor should have been stricken as a witness or a mistrial declared. Vincent contends Ticknor offered new and undisclosed opinions at trial contrary to the expert designation and an order granting his motion in limine.

The trial court granted a motion in limine that barred "[a]ny expert opinions of any witnesses not previously designated by Proponents." The order did not distinguish between testimony regarding testamentary capacity versus cognitive capacity. Vincent contends the trial court erred by allowing Ticknor to testify about Kenneth's testamentary capacity. He points only to the following single sentence in the Moczygembas' expert designation: "There is little, or no, medical or objective evidence Kenneth Andrews lacked *cognitive capacity* on the day he executed his Last Will and Testament on March 2, 2018." [Emphasis added.] However, the expert designation clearly stated Ticknor was "expected to testify regarding the mental and physical condition of Decedent Kenneth Curtis Andrews from February 19, 2018 to March 6, 2018, *including his testamentary capacity* at the time he executed his Will of March 2, 2018." [Emphasis added.] Based on the Moczygembas' expert designation, we conclude Ticknor's trial testimony regarding testamentary capacity did not improperly inject a new or different opinion at trial.

Vincent contends no amount of sustained objections to Ticknor's testimony or instructions to the jury to disregard could cure Ticknor's prejudicial testimony. Vincent also contends his constant objections to preserve error prejudiced him by giving the jury the impression he was trying to hide the truth. Therefore, Vincent concludes, the only viable cure was to strike Ticknor's testimony in its entirety or grant a mistrial.

Prior to Ticknor's testimony, the following conversation between the trial court and Vincent's counsel took place:

Counsel: But we're not letting him [Ticknor] go outside the report, are we?
Court: No.
Counsel: Is that – is that Your Honor's ruling?
Court: He's within the confines of the report, but – but this is about testamentary capacity versus cognitive –

According to Vincent, Ticknor violated the limine order when he testified it was his "opinion that [Kenneth] had what we call 'testamentary capacity,' the ability to understand and sign the Will." Vincent objected, the trial court sustained the objection, and instructed the jury to disregard the question and the answer. The court also instructed Ticknor to use the terminology in his report.

Ticknor was then asked what, if any, distinction he drew between cognitive capacity and testamentary capacity. Ticknor responded, "In the case of Mr. Andrews, I believe that they are interchangeable. I believe that he had the cognitive capacity to understand and sign his Will." The trial court overruled Vincent's objection and told Vincent's counsel he could inquire into the matter on cross-examination. Next, after displaying a PowerPoint slide for the jury that showed the definition of "testamentary capacity," Ticknor was asked to tell the jury "a little bit about [his] understanding of the elements of testamentary capacity." As Ticknor began to go through the slide, Vincent objected that the Moczygembas had agreed not to show the slide to the jury. The court took a recess and excused the jury to discuss the matter with counsel:

> [Vincent's counsel]: But, Judge, again, the jury's not gonna know what they are being asked to disregard after all this time. You're gonna have to tell them to disregard any statement from this witness that he had testamentary capacity on the day of the Will. And that's the only way that we can come clear – that doesn't even cure it, but that's the only way it comes close, because otherwise they're not gonna know what that –
> Court: Well –
> [Vincent's counsel]: – what it was.
> Court: Okay. Once again, we're playing a little bit on semantics here. "There is little or no medical or objective evidence he lacked cognitive capacity on the day that he signed the Will," which is kind of double negative.
> . . .

- 10 -

Court: Well, I'm gonna just simply instruct them to disregard the answer to the last question where he opined that he had testamentary capacity on the date that he executed the Will, simply because we're back to semantics, "cognitive capacity," which we've talked about ad nauseam. So it needs to be within the parameters of this report.

. . .

[Vincent's counsel]: So, I mean, we've got to move for a – we've got to move to strike, which I need a ruling on, and then I'm assuming that's denied.
Court: What is "strike"?
[Vincent's counsel]: Move to strike –
Court: Are you talking about the language –
[Vincent's counsel]: – the – all of his testimony.
Court: Okay. That will be denied.
[Vincent's counsel]: All right. Then we have to move for a mistrial.
Court: All right. That will be denied. Okay
[Moczygembas' counsel]: And you – can we make sure the witness is clear?
Court: Yeah, please do.
[Moczygembas' counsel]: He can testify as to cognitive capacity on February 26th.
Court: That's what the report says here.
[Moczygembas' counsel]: But not thereafter. And he can testify that there's no objective evidence that he lacked capacity on March 2nd.
Court: That's what his report says, and the deposition, seems to me, takes care of the other part of it, so, yes, he can.

When the jury was recalled, the court gave the following instruction:

. . . To be perfectly clear, any testimony you may have heard the Doctor say about testamentary capacity at the time of the execution of the Will, you will disregard, and they will follow up further.

On the date of the execution of the Will, the terminology, "testamentary capacity." I sustained that objection, but they can inquire further along the lines of the motions that we had prior to you being selected.
You may proceed.

The next objection occurred when Ticknor was asked:

[Moczygembas' counsel]: And I want to be careful that, you know, when we go to your opinion, it's – your opinion in this case is that there is no objective evidence that Mr. Andrews possessed testamentary capacity on March 2nd; is that right?
A. Actually, I believe it's: There's no reliable objective evidence that he lacked testamentary capacity to –
[Moczygembas' counsel]: Or cognitive capacity; is that right?
A. Or cognitive capacity. Thank you.
[Moczygembas' counsel]: Okay. And so when we talk about –
[Vincent's counsel]: Judge, we move to strike because they did it again.
Court: Okay.

[Vincent's counsel]: You made it clear what he could do and they just did it again.
Court: All right. I'll sustain the objection. . . . You're instructed to disregard the last question. Any answer elicited, you may re-inquire.

Next, Ticknor was asked how his opinion was affected by the fact that Kenneth died because of his heart problems:

A. It supports my conclusion that he did not die from hepatic encephalopathy, and that as of the time that he was discharged from the hospital, there was no evidence that he had – there was no evidence that he lacked testamentary capacity.
Q. And that's your opinion in this case?
A. And that is my opinion in this case.
Q. Thank you.

Vincent objected, the court sustained the objection, and instructed the jury to disregard the last question and any answer elicited.

When the basis for the requested mistrial is a violation of a motion in limine, we review the violations to determine if the violations were curable by an instruction to the jury to disregard the statement. *See Lohmann v. Lohmann*, 62 S.W.3d 875, 881 (Tex. App.—El Paso 2001, no pet.). Violations of a limine order are incurable if the instruction would not eliminate the danger of prejudice. *Id.* When a trial court instructs the jury to disregard evidence offered in violation of a limine order, we may review that evidence to determine whether an instruction to disregard was adequate to cure its admission. *In re City of Houston*, 418 S.W.3d 388, 397 (Tex. App.—Houston [1st Dist.] 2013, orig. proceeding). We presume jurors follow the instructions they are given. *Taylor v. Am. Fabritech, Inc.*, 132 S.W.3d 613, 625 (Tex. App.—Houston [14th Dist.] 2004, pet. denied).

In this case, we conclude the instructions cured the effect of the isolated incidents of Ticknor's complained-of testimony. Therefore, the trial court did not abuse its discretion by refusing to strike Ticknor's testimony *in its entirety* or by denying the motion for mistrial.

## C.      Rebuttal of Vincent's Expert's Testimony

Vincent contends the trial court erred by allowing Ticknor to rebut a majority of the opinions of his expert, Dr. Clayton, before Clayton testified. According to Vincent, Ticknor was asked if he had reviewed Clayton's report. Vincent objected that Ticknor was impermissibly trying to rebut Clayton's testimony during Moczygembas' case-in-chief. The trial court overruled the objection.

"Litigants in Texas are afforded a broad right to make strategic decisions when introducing evidence at trial, and they are entitled to present experts in a manner of their choosing, so long as it is consistent with the Texas Rules of Civil Procedure and the Texas Rules of Evidence." *Gunn v. McCoy*, 554 S.W.3d 645, 667 (Tex. 2018). "A party, as a matter of trial strategy, is entitled to present his evidence in the order he believes constitutes the most effective presentation of his case, provided that it does not convey a *distinctly false* impression." *Jones v. Colley*, 820 S.W.2d 863, 866 (Tex. App.—Texarkana 1991, writ denied). Here, Vincent does not assert that Ticknor's testimony presented any distinctly false impression as to Clayton's testimony. Instead, he argues Ticknor's testimony was used to disprove facts and opinions that were not yet in evidence.

Ticknor's reference to Clayton's testimony regarding Clayton's deposition was in the context of his review of notations made in Kenneth's hospital medical records—by different treating doctors—and Ticknor was asked his opinion about what each doctor's notation in the records indicated. The jury had already seen the medical records from Kenneth's hospital stay. After the trial court overruled Vincent's objection, Ticknor was asked about notations Clayton made that Vincent would use to argue Kenneth lacked testamentary capacity. Ticknor did not criticize Clayton's opinion; he merely described his knowledge of medical terminology by Clayton. On this record, we cannot conclude Ticknor's testimony was offered as *rebuttal* testimony.

**D.      Vincent's Fee Agreement**

Prior to trial, the court granted Vincent's motion in limine and instructed the Moczygembas to refrain from "mentioning, eliciting or offering any evidence concerning . . . without further order of the Court . . . [a]ny reference to the contingency fee agreement between Vincent and his attorneys."  Vincent asserts the trial court erred by allowing the Moczygembas' attorney to ask Vincent a single question about whether he had a contingency fee agreement:

> Q. To be clear, in this case, you are on a contingency fee agreement with The Hartnett Law Firm, aren't you?
>                          . . .
> A. Yes, I am on a contingency fee.

On appeal, Vincent asserts the Moczygembas used this testimony in an attempt to prejudice him and "dissuade any sympathy towards" him.  He contends his fee agreement was privileged, not discoverable, and irrelevant.[1]  The Moczygembas counter that Vincent's counsel opened the door to this testimony.

A party opens the door to evidence by injecting collateral and otherwise-objectionable issues into a lawsuit or by presenting a witness's testimony that conveyed a false impression." *Horizon/CMS Healthcare Corp. v. Auld,* 34 S.W.3d 887, 906 (Tex. 2000) (trial court did not err by admitting reports that nursing home had been cited for rendering improper care; without that evidence, "the jury would be left with a false impression that Horizon had not been cited for rendering improper care when, in fact, it had").  To determine whether Vincent opened the door, we examine the testimony that led up to the complained-of testimony.

During the Moczygembas' direct examination of their attorney's fees expert, James McNeel, counsel asked the following:

> Q. And you've testified that you understand that Casper [Moczygemba] is – has an hourly rate, correct?

---

[1] Vincent did not argue privilege before the trial court; therefore, this complaint is waived on appeal.

A. Correct. It's not fixed or contingent.

Q. Can you explain to the jury what a contingent fee involves?

A. So a contingent fee case is where a client comes to you that doesn't have any money to pay your fees on an hourly basis and you agree as the lawyer of the law firm to take on the risk of investing in that case, both the time that you're gonna spend, which could be, you know, six months or it could be six years, and hiring experts, coming out of your own pocket to pay for experts and other expenses, not knowing whether you'll recover those moneys or not. And so in those kinds of cases, there's a percentage of any recovery that the attorney gets.

And under the Probate Code, it's deemed reasonable to accept a 33 percent recovery. The recovery can be higher than that if there are special circumstances or if you can establish to the Court that there were – not just special circumstances, but, you know, more difficult issues and reasons why the percentage should be higher than it is.

Q. And based on what you know about the value of the estate and the inventory and the legal fees of Jackson Walker, the legal fees of Jackson Walker, are they in excess of that Estates Code provision?

A. Well, if you were to take this case on a contingency and take a 30 percent cut and you were to recover 6 million, your fee would be approximately $2 million.

Q. So the fees of Jackson Walker are, at least at this point, beneath that amount?

A. Less than half, yes.

During McNeil's cross-examination, Vincent's counsel asked:

Q. Sir, you told [Moczygembas' counsel] that the Moczygembas can – if [the Moczygembas] can recover their fees when they defend a Will in good faith and with just cause, correct?

A. Correct.

Q. Vincent doesn't have a Will to defend, correct?

A. Correct.

*Q. So under your understanding of the Estates Code, he can't recover his attorneys' fees in this case, correct?*

*A. Correct.* [Emphasis added.]

The next day, the Moczygembas asked the trial court to reconsider its limine order, arguing:

The Court will remember that one of the motions in limine is that we would be prohibited from going into how Vincent is paying for his attorneys' fees.

Based upon the testimony today in which Mr. Hartnett [Vincent's attorney] emphasized that Vincent didn't have the ability to recover his attorneys' fees, the jury was left with the improper assumption that Vincent was paying attorneys' fees in this case.

The Moczygembas' attorney asserted that Vincent's question about the expert's understanding of the Estates Code opened the door to a discussion of the contingency agreement

on fees. He argued that the wording of the question implied Vincent had expended funds or attorney's fees in this case and, if he lost the case, he would not be able to recover his fees. Counsel stated, "in the context of a long discussion with Mr. McNeel in which the jury heard that the Moczygembas have incurred over half a million dollars in attorneys' fees . . . [i]t's not difficult for a jury member to assume, based upon the question and answer asked, that Vincent has perhaps expended over $500,000 in attorneys' fees and that he doesn't have the same ability to recover them."

Counsel explained he wanted to ask Vincent whether he was "moving forward with this case on a contingency fee agreement," and he wanted only to have the jury understand "it's clear that there's no money that he's out because, again, based upon the question and how it was asked, there's an impression upon the jury, again, that [Vincent] is gonna be out attorneys' fees, based upon the questions that are gonna be presented to the jury [in the jury charge]." He further contended Vincent "has no attorneys' fees that he's expended at this point. The jury deserves to have the proper information in front of them. It doesn't need to be a long diatribe about it, but just to simply correct the misimpression."

Vincent's attorney countered that Vincent's contingency fees were irrelevant and he asked the question on cross-examination about the contingency fee because the Moczygembas were presenting attorney's fees evidence, Vincent was not, and he "wanted to make sure that nobody on that jury was thinking that somehow we were prevented from presenting evidence for some reason."

The court overruled Vincent's objection. During the Moczygembas' cross-examination of Vincent, counsel asked:

> Q. So, Vincent, in this case yesterday, at the end of the day, we heard a good bit of testimony about attorneys' fees in this case; is that right?
> A. Yeah. Yes.

Q. To be clear, in this case, you are on a contingency fee agreement with The Hartnett Law Firm, aren't you?
[The trial court overruled Vincent's objections.]
A. Yes, I am on a contingency fee. [Counsel then passed the witness.]

We conclude the trial court did not abuse its discretion by allowing the single question about Vincent's contingency fees. That one question was for the purpose of preventing the jury's false impression that Vincent was incurring attorney's fees that he was prevented from recovering.

**CONCLUSION**

For the reasons stated above, we overrule Vincent's issues on appeal and affirm the trial court's judgment.

Lori I. Valenzuela, Justice